I have to begin this presentation with an apology to the Court. When I was preparing for this argument Friday, I discovered that I had inadvertently cited the 2001 version of the Idaho Uniform Commercial Code. I should have been citing the 1979 version. I immediately mailed to the clerk under Federal Appellate Procedure 28J a Certificate of Additional Authority outlining those correct sections. I have no excuse. I made a mistake. I apologize. Having said that, both issues in this case involve primarily issues of Idaho law. The questions of the nature of bank accounts, the interest in bank accounts, the function of bank accounts. We are not operating with a blank slate. The function of the banking system is very heavily controlled or at least regulated by a statutory scheme, the Uniform Commercial Code. I don't understand why that issue controls. I mean, certainly it's correct that when you put money in a bank account, they're not holding the cash for you. All you do is you lend it to the bank. They promise to pay it back on demand with interest. That's what a bank account is. But I don't see why that matters. Well, it matters because the question is whether or not, under the 548 claim, it was a transfer of an interest of the debtor in property. But the property need not be the cash. The property can be the claim. Well, the claim that the depositor has on the bank. Into the depository account, under the huge body of law we cited, once that deposit is made, that money ceases to exist. It doesn't exist at all. Debtor can't get it back. Trustee can't get it back. It's simply gone. It's owned by the bank. You mean the cash doesn't exist? I beg your pardon? You don't mean the money doesn't exist, I don't think. I think you mean the cash is no longer the depositor's cash. Most of the authority uses the term the money. The money no longer exists. I wrote one of these decisions, and I remember commenting on that, and that it's sometimes loosely used. But what it meant was that the cash is no longer the depositor's. What the depositor now has in exchange for the cash is a promise. Is a promise. The creditor-debtor relationship that's so often referred to, that there's this obligation by the bank to pay to this depositor, the account owner, in accordance with the terms of the account agreement. And then what the bank does when they find that the depositor is distressed and owes the bank money, is they say, instead of paying our depositor back, we are going to pay our depositors what we owe the depositor to ourselves and release the depositor pro tanto from the depositor's obligation to us, because they're mutual obligations. Correct. Under the theory of offset. Of course, if the title, if it's an Article 9 security interest, the concept changes. No, it's not an Article 9 security interest. It's under Articles 3 and 4. Well, under the Uniform Court of Code in Idaho, we recognize, actually, under Idaho statutes, there's three concepts. There's a banker's lien. There is a concept of the right of an offset, which is merely the offset of two matching obligations. The bank owes the depositor money. The depositor owns the bank money. We do the paper entry and it's gone. And it's all fine as long as there's not a preference. Right. But there's a third concept, which is the Article 9 security interest, which is what we're saying exists in this case, because under the Idaho Uniform Commercial Code, you can have a security interest in a depository account in two different ways. One is if the money that's being deposited into this account are the proceeds of collateral. And in this case, it's undisputed that D11's bank, both as to Kelly Fox individually, who is actually the owner of this account, and the corporation, Fox Bean Company, Inc., had valid security interests covering all accounts and receivables. And so the money that was going into this account, being the proceeds from the business, the accounts and the receivables, either as to Kelly Fox or as to Fox Bean Company, Inc., was collateral of D11's bank. But it goes one step further in Idaho. And this is under Section 104 of the 1979 version of the code. Originally, that section had a subsection K, and 104 is exclusion section. Under Section 104K, the exclusion included transfer of an interest in a depository account. In 79, the Supreme Court excised that language and added 104L, which excludes a transfer of an interest in a depository account other than interest created by proceeds of collateral. And I'm paraphrasing the statute. I'm sorry. But the concept of whether or not you can have a Article IX security interest in the depository account itself, and I cited the Norton citation that referred to this to the Court, 104 distinguishes between a transfer of an interest and a security interest. If you look at 104A, it excludes security interest created under statute. It doesn't talk about transfer of interest. And my interpretation of statute is that that subsection L doesn't exclude security interest in depository accounts. It excludes transfers of an interest in a depository account. So our position is that there is an Article IX security interest both under the concept of proceeds and under the concept of an outright security interest in the depository account. Why would we go any further than the Federal statute, 11 U.S.C. 553b1, governing precisely this situation set off of mutual debts? Because if it is – well, first of all, there's no mutuality. He commingled. The debtor – the farmer and his corporation commingled to such a great extent that that's kind of a stretch for me. For the purposes of my argument, I'm willing to concede that every dime that went into that account belonged in some fashion to the corporation. What I'm saying is under Section 68309 that that's not only permitted in Idaho, it's actually encouraged. And that's the Uniform Fiduciary Act. And what it says is that a fiduciary can deposit its principal funds in its own account, in its personal account. And the bank is under no duty of inquiry. And thereafter, the fiduciary owning the account has the right under the Uniform Commercial Code to make the orders on the account, to write checks or to make transfer orders. In this case, that's precisely what happened. And as I understand it, at least, the Idaho law relative to property interest is supposed to control the concept of property in this case. So we have an Idaho statute, as I say, that specifically limits the bank's liability and protects the integrity of that fiduciary's account from this kind of challenge. And I think there's an important policy there that really needs to be addressed. If you look at this body of law we cited on banking and its practices, through the Uniform Commercial Code and the way the liabilities are created through the Uniform Fiduciary Act, in order for our banking system to function the way it does, you've got three things you've got to have. You've got to have freedom of deposit. They don't want banks acting like gatekeepers when money's coming in. Number two, they don't want or they want to have freedom of orders. They don't want the bank acting like a gatekeeper with money coming out. They want free flow of money through this account, and that's what the fiduciary act addresses. The third thing is finality, that if I get a check in payment of a debt, once that check clears or the midnight deadline passes, the transaction is final. Now, under the theories adopted by the courts below, to give a hypothetical, let's assume for a minute that instead of Kelly Fox making that payment order to pay that proprietorship note, those are all standard principles and correctly stated of the law with regard to banks' handling of checks, accounts, and so forth. But I don't see why they bear on the set-off issue. Well, there are two separate issues here. There's the 548A issue, and the primary issue under 548A is did the debtor have an interest in that account? At the time of that transfer, such that the transfer was in interest of the debtor in property. The 533A, which is the offset issue, because we've got the 548 fraudulent transfer, and the 533B, which is the offset issue. Oh, I think I see why I'm having trouble understanding you. As I understand this area of law on bankruptcy law and the 90 days, it really doesn't matter whether the preferred creditor did anything bad or wrong or contrary to law or in any way improper, as the creditor can be a legitimate creditor who entirely properly receives payment of the debt, but the trustee can still suck it back into the estate. Correct, and I absolutely agree with that. And that's the position that it looks to me like the bank is in. Evilness has nothing to do with it. But what does have something to do with it is the concept of property under Idaho law. And here's the dilemma. And to come back to the hypothetical, you've got two issues that were created here. Finality. Take, for example, if the trustee or, excuse me, if the debtor, with Kelly Fox, I'm sorry, Finality. I'm going bankrupt. A week before I file, I owe two debts, one to a creditor that I dislike who's been giving me nothing but trouble, and the other one to my beloved mother-in-law. So I pay my mother-in-law. The trustee, and I hand the cash over to her. It's final. There's nothing wrong with it. It's intended by both of us to be final. She takes the money. She puts it in her bank account. Which means it's gone. Just as you say, the trustee can still get it back. He can split it between my beloved mother-in-law and the creditor I don't like. But only if it's a property interest of the debtor under Idaho law. If it's not a property interest of the debtor under Idaho law, he can't get it back. Now, he does have a property interest. When you own a claim against a bank for money, that's property interest. Government couldn't take it without paying just compensation. Nobody else can interfere with it without being subjected to liability. That comes to the 533B claim again, Your Honor. It doesn't have to be tangible property. There the trustee is trying to take a security interest of the bank. That's our property. And they're trying to take it from us without paying just compensation. But there's another concept here, though. I keep wanting to come back to it. And that is this idea that somehow this money can be traced through the bank account. Where does that end? What happens if Kelly Fox writes a check to the U.S. Treasury to pay his taxes? Can the trustee get that? What happens if Kelly Fox orders a transfer into Wells Fargo Bank and then writes a check to pay his taxes? Can the trustee go get it from the U.S. Treasury? The banking system cannot function the way it functions if you have this ability to trace through and undo settled transactions. It would and has changed banking practices because the bank has to start acting like a gatekeeper. Why? Why? Because of the exposure. I mean, why does we can't require banks to act as gatekeepers on management of their depositors' deposits. I have no doubt you're right on that and that that is a correct statement of the law. But I don't see what that has to do with this set-off issue. Well, the set-off issue, it has to do with this concept of property and mutuality. Also under that set-up, the trustee had the burden of proving we were undersecured on the day. That's a different debt accord. But under that 533A, there's no mutuality because the corporation did not have an account agreement with the bank. And there were no nasty entangling circumstances like using checks with the corporation's name on it. No. The signing in a representative capacity, no. Deposit slips were all proprietorship, no corporate proprietorship. The endorsements on the checks were all proprietorship stamp endorsements. Everything that happened in that account to the date it was closed was done in an individual capacity except for the fact that the fiduciary was depositing funds under Section 68309. Thank you. Thank you, Counsel. May I please talk? Go ahead. Monty Gray, Counsel for R. Sam Hopkins, a trustee. Could you talk a little louder? I'm having trouble hearing you. I apologize. I will do my best to talk louder. The trustee's concerns with this case focus in a few different areas that seem to be contradictory. First, what we have is that when the trustee initially approached the bank, the trustee requested information regarding the circumstances related to the transfers that took place. The bank initially told the trustee that what they had done was effected a set-off of the corporation's assets and applied it to the corporation's note. Well, that changed by the time we arrived at trial. At trial, the bank officers had changed their mind, and they said that that initial letter that they had sent the trustee was an error, that instead what they were actually doing is that they just thought that this bank account was the personal bank account of the shareholder and that what they were doing was just effecting a set-off of the personal guarantee of the shareholder. Well, now here on appeal, they are not standing behind that argument anymore. From what I understand, they are arguing in part that they were foreclosing on a security interest. Well, none of that was stated at trial. When their officers were directly asked what they were doing when they took the money out of the accounts, and this is evidenced in the supplement to the excerpts of record on pages 89 through 91, they stated we were setting off a personal guarantee of the shareholder when we took that. What pages? That was the supplemental excerpts of record that I submitted, and those are pages 89 to 91, where the court is asking additional questions of Greg Newberry, the bank loan officer that effected the set-off. In addition to that, I see other inconsistencies. First of all, the bank argues that there's no property interest of the debtor. If there's no property interest of the debtor, how is it able to foreclose on it? There has to be a property interest of the debtor to effect the foreclosures, what they're arguing right now. In addition to that, that also ties into mutuality. How can they effect the set-off if there is no mutuality and no property interest in the debtor? I believe that Idaho law is fairly clear on what type of rights are held when you deposit funds into an account. In fact, in essence, the court in Idaho in the Earhart-Leonard decision I cited in my brief, of course, said that when you deposit your monies into the account, that does nothing to change the ownership, unless if there was some intent on behalf of the depositor to make a conveyance or a gift through that deposit. So the existence of the account agreement or deposit into the account alone is not sufficient to convey that ownership interest to somebody else. Is there any need to go beyond, in the analysis, 11 U.S.C. 553-B1? I don't believe so, Your Honor. And in part, it comes back to the statements made by the bank on the record when they said that they – there was nothing stated on the record on their own part that they were ever trying to foreclose a security interest. And so since they were not foreclosing a security interest, and I don't see how any Article 9 – They said he was up to date on his payments, but they thought he was going to fail because the Mexican loan wasn't being paid to him, or Mexican account wasn't being paid to him. So it couldn't be foreclosure. Well, how it came – no, they did feel that there was a default. And they believe it was a default. Which transaction are you talking about? There were two different transactions. Yes. And when I'm referring to the event of default, I'm referring to the May 24th transaction. That's the second one. That's the second transaction. That was the money that the trustee says belonged to the corporation. That's correct. In fact, what the trustee did in this case, and it was also supported by the findings made by the bankruptcy court at trial, is that the trustee did a direct tracing of every single item deposited in those accounts to reflect that all the monies held in that account were corporate assets at the time that either the first transfer took place or that the second set-off took place. And I admit I was slightly aided by the fact that the debtor had zeroed out his account balances only a number of transactions prior, and so it made it somewhat easier to do that. And tying that to the idea of these assets that are out there, that's also an additional inconsistency in that the debtors argue that also in their brief that they were oversecured. In fact, reference it as high as 10 to 1 of the evidence they stated. Well, if they were oversecured, well, then I think that also flies counter to their position that they took, that there was a default based off of the unstable financial situation of the company. In addition to that, I'd also like to address a couple other issues that were mentioned by counsel in this matter. The bankruptcy court found not only did they decide that they weren't going to believe the banks switched position on what was taking place, that the bank also found that the bank had personal knowledge that this account was being used as the corporate bank account. Now, that creates a whole different situation. I mean, all the protections that normally run the banks in situations where they don't know what's going on and taking money out of an account, that all changes. And, of course, that impacts our case not so much to the state law, but it also comes into play under 550, where we're also allowed to collect against any subsequent transferees of that debt because they knew the nature of what was going on and what proceeds were held in that account. And that also applies to all those gatekeeper safeguards that we heard from opposing counsel. Pretty well, if you look under state law that allows banks to have certain protections and not require them to be gatekeepers, most of those have an exception that say, unless the bank has personal knowledge that there's a different type of situation here. And this especially takes control and authority in a situation where we have a situation where it's actually the bank themselves that are taking money to apply it towards a corporate note when they know whose money that is that's in the account. Because of their statements at trial and them taking the position that they were not doing a set-off or a foreclosure of the security interest of the debtor, but instead all they were doing was foreclosing on personal guarantee, the trustee also moved off of its claim of a preference under 547. And under that claim of preference under 547, as to the – let me make clarification of that – as to the second transfer on May 24th. We approach that from strictly a set-off point of view. Under 547, that also allows the bankruptcy trustee to limit creditors who have a secured interest in accounts receivable to what they would have received 90 days out. Now, that 547 case law that allows you to hold a creditor to their accounts receivable that they could have received 90 days out from the filing of bankruptcy also seems to coincide with the set-off provisions of 11 U.S.C. 553 that also makes them pretty well say that, well, you can't get in a better position than you were 90 days prior to filing bankruptcy because the whole goal is not to try to have banks throw a bunch of people into bankruptcy because of foster work out. Well, that's exactly the problem that happened in this case. He was current. They took the money. It pushed him right into bankruptcy eight days later. And I do believe – Are you talking about the corporation now or the individual? This is the corporation. I thought you said he. I do apologize on my pronoun. I do mean the corporation. With that said, the trustee would recommend that the appellant's appeal be dismissed. Thank you, counsel. Thank you. This 553B claim, what I'd like to emphasize there, if that is collateral, the D11's bank, that's a real property interest. I don't care if you call it offset or application of the debt or foreclosure. That is D11's collateral, and they don't lose it. There's no concept of election remedies in Idaho. If this is an offset and it doesn't work, we still have a secured right in that money. And when you apply an account, when you enforce your security interest, all you do is do book-setting offsets. So the terminology is a distinction without a difference. The difference is what right you have at that point in time. In Idaho, well, that's a different case. But the other thing I think we need to emphasize is that the reason this thing is on appeal to this Court is that the ramifications go well beyond bankruptcy. Bankruptcy is only a small part of the ramifications of this reported decision that currently exists. The claims, the potential claims of interest in account exist in every deposit. If someone comes in and deposits cash, the bank has no way of knowing if it's going to face a third-party claim sometime in the future as an ownership interest in the account. Even a check that comes in for deposit, you have no idea if that check represents a transfer, under the theory of Judge Beistlein, of a third-party interest out of another account that can be traced. Whenever you accept a check and release collateral, you are at risk, in this case a year later, that you're going to be sued. And those are very strong incentives and disincentives to banking practices. And I can give you a good real example. D.L. Evans does not offset anymore. They freeze the account. Then they proceed against other collateral. And they won't apply that account for a year because of the liability under 548A and 533B. Well, that's not what the Uniform Commercial Code says you're supposed to do. So you create a significant impediment to the flow of money, the release of collateral, and the function of the Uniform Commercial Code. There is a significant body of law that exists on this concept of property interest in a depository account. You would think there would be some case somewhere that says when a fiduciary deposits his principal's funds in his own account, the principal acquires a property interest in the account. Nobody has found or cited such a case. We do have two Idaho cases that are reasonably close, though antiquated. We have the Green case we cited, which was the father, in 1901, deposited his daughter's money in an account he set up in her name, fraudulently to avoid creditors, and then subsequently wrote checks on the account and took the money. The daughter turned around and sued the bank in a theory of conversion. And said, the Idaho Supreme Court said no. She didn't acquire a right simply because her funds were deposited in this account. We had a second Idaho case, White-Delaney, where you had a trustee who took money out of a trust account and moved it over into his personal account. There was an action brought against the bank, who arguably had actual knowledge that this was trust money, and the Idaho Supreme Court said, again, in 1929, no, that owner of that money did not acquire an interest in that account, or a right to sue the bank, I'm sorry, simply by virtue of the fact that this fiduciary deposited its principal's funds in the account. That's consistent with the provisions of the code we cited on the Uniform Fiduciary Act. Or, I don't know why the Idaho legislature adopted that act. I don't know what policy, I can only speculate what policy they were trying to accomplish. But the act is clear. The other thing that we have is Section 717, I cited in my brief, where there is a remedy. There's a specific statutory remedy that was available to the debtor in this case if it wanted to challenge those deposits. It's specific and expressed, and it would not fall. Thank you very much. Thank you, counsel. D.L. Evans Bank v. Hopkins is submitted.
judges: Browning, Alarcon, Kleinfeld